## JOHNSON *v.* BARNEY & CO.

Where suit was brought by the indorsee of a negotiable certificate of deposit against the makers, and the answer of the defendants alleged that the plaintiff was not a holder of the certificate in good faith, and for a valuable consideration, but that it was still the property of the indorser of the plaintiff—that no *bona fide* transfer had ever been made—that the original payees deposited the funds for the indorser of the plaintiff, and as his agents—and that the certificate was obtained by fraud and deception, and without consideration, setting out the facts; and where it appeared from the evidence, that the indorser of the plaintiff was indebted to him, and remitted him the certificate, with instructions to apply it to the credit of the indorser, when collected; *Held*, That the plaintiff occupied the position of collecting agent for the indorsee, and not that of a *bona fide* holder, without notice; and that he held the certificate subject to the equities existing between the makers and indorser.

And where it was a matter of controversy, whether the defendants received certain bank paper on the faith of the representations of the indorser of the certificate of deposit, or his agent, as to the solvency of the bank, and his undertaking to redeem the same, the said bank paper being the consideration for the making of said certificate, or whether they received it at their own risk, relying alone on the credit of the bank; and, also, whether the said bank paper was entirely worthless, having no market value as money; and the plaintiff asked the court to instruct the jury as follows: " 1. That if the jury believe from the evidence, that fifty-five dollars was deducted by W. J. B. & Co., from the $2,000, and that that was a larger amount of exchange than was usual for currency, that is a fact tending to show that W. J. B. & Co. bought the notes at their own risk. 2. That the fact that the bank suspended payment, is not, of itself, evidence that the notes were of no value; and that if the jury believe that the notes were of some value, they must find for the plaintiff. · 3. That the fact that the bank suspended payment, is not evidence of itself, that the notes were worthless; and that the defendants must prove that the notes were worthless, before the jury can find a verdict in their favor. 4. That if the jury believe that there is a large amount due to the bank, and that the bank never redeemed a single note at less than par, and that the principal part of its circulation was paid in by debtors to the bank, and a large amount settled by note holders taking individual paper belonging to the bank; and if they further believe that there is no evidence as to what is the present condition of the bank, further than to say it is insolvent, and has a large amount due to it; in such case the jury should find that the notes were of some value, and that they must, consequently, in such case, find for the plaintiff," all of which instructions were refused. *Held*, That the instructions should have been given, and that the refusal to give them was error.

The fact that a bank has suspended payment, may be, and is, a strong circumstance to show that its paper is of no value, but it is not conclusive evidence of the fact.

Where there is any conflict in the proof, or doubt as to the actual value of property, such conflict and value should be left for the consideration and determination of the jury.

A party cannot defeat an entire demand, on the ground of a partial failure of the consideration, without showing that he returned, or offered to return, that consideration, and rescind the contract. If he has not done so, and the consideration is of any value, he is liable to that extent.

*Aliter*, where there is an entire want or failure of consideration.

*Appeal from the Dubuque District Court.*

THIS action was brought on the following instrument:

"$945.                      Certificate of Deposit, No. 434.
   "Banking-house of W. J. Barney & Co.
                           "DUBUQUE, Iowa, Aug. 18, 1854.
   "Hawthorne, Childs & Co., has deposited in our office, in currency funds, nine hundred and forty-five 0-100 dollars, payable to the order of themselves, on return of this certificate, thirty days from date.      W. J. BARNEY & Co."

On which are the following indorsements:

. "Pay to the order of P. B. Ring,
                           "Hawthorne, Childs & Co."
"Pay to the order of M. Y. Johnson,
                           "P. B. Ring, per H. B. Ring."

This certificate was duly presented, and protested for non-payment.

The defendants in their answer, set up that Johnson was not a holder of the certificate in good faith and for a valuable consideration, but that it was still the property of P. B. Ring, and that no *bona fide* transfer had ever been made from Ring to Johnson. Also that the original payees deposited the funds for Ring, and as his agents, and with his knowledge and procurance; and that the certificate was obtained by fraud, deception, and without consideration, which is particularly set out, but which it does not seem to be

necessary to here state more at length.   The replication denies all the material allegations in the answer.   It is also conceded, that this instrument came into the hands of the plaintiff before maturity.   The material portions of the testimony, as also the instructions, will be found referred to in the opinion of the court.

Judgment being rendered for the defendants, and the usual motion for a new trial overruled, plaintiff now appeals.

*Smith, McKinlay & Poor*, for the appellant.

*James Burt* and *Wiltse & Blatchly*, for the appellees.

WRIGHT, C. J.—That Hawthorne, Childs & Co., were the agents of Ring in procuring this certificate, and that it was in fact his money that was deposited, and that the indorsement to him, was without consideration, is conclusively shown by the testimony, which is all embodied in the record. So that whether Ring was, or was not, an innocent holder, is not a matter of doubt, as it is clear that whatever fraud or deception there was in the premises, was at his instance, and designed for his benefit.

The first inquiry then is, was the plaintiff a *bona fide* holder for value, without notice, of the instrument, or was he merely the agent of Ring, and holding the same for him. And before stating the testimony that relates particularly to this point, it is proper to refer to the general features of the transaction.   It appears that Ring was a banker, residing in the city of Chicago, and held an office in the Farmers' Bank of that place.   As such, he had received a large amount of the notes of the Farmers and Merchants' Bank of Memphis, Tennessee, directly from the bank, the circulation of which money, the testimony tends to show, he had agreed and undertaken to protect and keep good in and about Chicago, and perhaps the northwest.   Before the time of giving this certificate, he had redeemed said Tennessee money, or so much of it as bore certain marks, at his bank at Chicago.

It appears that about the 18th of August, 1854, he came to Dubuque with a large amount of this money, and spoke of its being good, and of his obligation to redeem it at his counter in Chicago, and that finally he succeeded, through Hawthorne, Childs & Co., or some member of that firm, in negotiating two thousand dollars with the defendants. For it, was given a sight draft on New York, payable to P. B. Ring, for $1,000, and the certificate here sued on. On the 21st of August, 1854, this paper, with some other having the same mark, was presented for redemption at the counter of Ring's banking-house in Chicago, by the agent of defendants, and redemption refused. About the 20th of August, or before that time, the Memphis Bank suspended, and since then has not paid its bill holders; but whether it is entirely insolvent and unable to pay, does not conclusively appear, the testimony on that subject being somewhat conflicting.

For the purpose of showing the character in which the plaintiff held this instrument, the two following letters were produced by him, at the instance of the defendants, which contain all the testimony offered by either party on that subject:

FARMERS' BANK, Chicago, Aug. 20, 1854.
M. Y. JOHNSON, ESQ., *Galena,*

    Dear Sir:

I will remit you to-morrow a certificate of deposit, maturing within thirty days, for one thousand dollars, which please credit my account (less discount) of coin had of you. When you must use the balance, please advise a few days in advance, or draw at as many days' sight as you conveniently can.          Truly yours,          P. B. RING.

FARMERS' BANK, Chicago, Aug. 21, 1854.
M. Y. JOHNSON, *Galena,*

    Dear Sir :

Inclosed we hand you W. J. Barney & Co.'s certificate.

of deposit for $945, which, when matured, you will please collect, and place amount to our credit, and oblige,

Yours,        P. B. RING & Co.<br>Per H. B. RING.

From these letters, it now becomes our duty to determine, whether Johnson was the holder of this instrument, so as to be unaffected with any previous equities in favor of defendants. He being the holder, the presumption is, that he holds it for value, without notice, and *bona fide*. To rebut this presumption, the burden of proof is upon the defendants. Have they produced the necessary proof in this case? While the authorities are not entirely uniform, yet it may now be regarded as settled by the current of decisions, that the rights of the holder of a negotiable instrument are the same, whether the debt for which it is transferred is pre-existing, or contracted at the time of the transfer. *Coolidge* v. *Payson*, 2 Wheat. 66; *Tounsley* v. *Sumrall*, 2 Pet. 170; *Swift* v. *Tyson*, 16 Pet. 1.

A question of more difficulty has frequently arisen; and that is this: What are the rights of such holder, where he receives the instrument merely as collateral security on a previous liability, and not in satisfaction of it. In this case, however, we do not think there can be any fair pretence, that the certificate was transferred in satisfaction or discharge of either a previous liability, or one contracted at the time. It cannot be deduced from either letter, that any security was given up by Johnson; or that time was given on any previous debt; or that any new consideration intervened. But, on the contrary, the money payable by the draft was to be collected, and then, and not till then, placed to the credit of the indorser. Whatever debt was due or payable from Ring to plaintiff, was not altered by this arrangement. As to that, everything remained as if this transfer had never been made. Without considering the question then, whether, if it was a transfer of a claim merely as collateral security, previous equities would thereby be discharged, we next inquire, whether it was taken

even as such collateral? For if it was not transferred as collateral, at least, we think it entirely clear, that it would be subject to the same defences, as if held by Ring, or the original payees. And, after due consideration, we feel constrained to say, that giving the language of these letters its plain and received import, Johnson was but the agent of Ring in the collection of this money, and did not receive the certificate in security for any antecedent indebtedness, or a liability created at the time of the transfer. It is true that the letters show an indebtedness, and this is all that is shown material to this question by the first one, for that speaks of sending on the next day "a certificate of deposit for one thousand dollars." The one there referred to, could not be the one finally remitted by the letter of the 21st, for that is conceded to be the one sued on, which is for nine hundred and forty-five dollars. Whatever, then, might have been the circumstances and conditions upon which the thousand dollar draft was transferred, are immaterial, when considering the transfer arising in this case. And, therefore, inasmuch as the indebtedness is sufficiently shown by the second letter, for the purposes of this view of the case, we need not have further reference to the first. From this second letter, we learn that plaintiff was to *collect* the money due on the certificate, when it matured, and place the amount to the credit of Ring. From the language used, we cannot resist the conclusion, that Johnson occupied the position of the collecting agent of the indorser, and not that of a holder for a consideration, present or antecedent, or as security for an indebtedness. In so holding, we are not unmindful of the tendency of our courts, and the policy of trade and commerce, to protect, as far as possible, the rights of holders of negotiable paper. But there should be a just limit, of course, to this tendency and policy, lest we prejudice the rights of the payor. And having due regard to both these considerations, we cannot see upon what legal or equitable ground, Johnson should occupy any better position than could Ring, if he had sued on this instrument. As far as disclosed, he has given up no claim he had against

Ring. He has parted with no security which he before that time may have had. He has made no agreement that tends to show, that he accepted this certificate as sufficient, or even partial, security upon his indebtedness. There is nothing to show, but that at any time he could have demanded other arrangements, for the purpose of being secured, or immediate payment of his debt. If the certificate was not collected, he was not to be the loser, nor yet need he resort to his action against Ring as the indorser, in order to realize so much of his debt. On the contrary, the transaction to our minds appears, not an unusual one, but susceptible of being easily comprehended, and construed, without a reasonable probability of injury to any one. Ring is indebted to Johnson; he holds a certificate of indebtedness against defendants, who reside near the plaintiff; he, therefore, sends it to plaintiff, and tells him, when this matures, collect it, and credit me with the proceeds. In order that Johnson may draw the money, however, it is indorsed to him. Under such circumstances, it appears to us that Ring, so far as the rights of the defendants are concerned, is just as much the owner of that certificate, as if he had never indorsed it. To our minds, it would be most palpably unjust, under this proof, to treat Johnson as a *bona fide* holder for value, without notice, and thus preclude the defendants from any defence which would avail them against Ring, and especially so, when we consider, that by the testimony of H. B. Ring, who wrote the second letter, or in some other way, we may well conclude, that the character of the transaction, as developed by these letters, might have been explained, if, indeed, it was different.

This view of the case, renders it unnecessary to consider the further question, whether the instrument sued on is negotiable, so as, when negotiated, to be discharged of previous equities. For, if not in fact transferred to a *bona fide* holder, whether negotiable or not, the rights of the defendants must, in this respect, remain the same. And we may also say, that in thus concluding that Johnson was not an innocent holder, we, of course, intimate no opinion as to the

sufficiency of the proof to defeat the demand, even when thus held. And it will not become necessary for us to view that aspect of the case, for we think it must be reversed on other grounds.

From the proof made, and the instructions in chief, given by the court, it appears to have been a matter of controversy, whether the defendants received this Memphis money on the faith of the representations of Ring, or his agent, as to the solvency of the bank, and his undertaking to redeem the same; or whether they received it at their own risk, relying alone on the credit of the bank; and also, whether there had been an entire or partial failure of consideration; or, in other words, whether the said Memphis currency was entirely worthless, having no market value as money. Under a state of pleadings and proof, legitimately raising these questions, the plaintiff asked the court to give the following instructions:

" That if the jury believe from the evidence, that fifty-five dollars were deducted by W. J. Barney & Co. from the $2,000, and that that was a larger amount of exchange than was usual for currency; that that is a fact, tending to show that W. J. Barney & Co. bought the notes at their own risk.

" That the fact that the bank suspended payment, is not of itself evidence that the notes were of no value, and that if the jury believe, that the notes were of some value, they must find for the plaintiff.

" That the fact that the bank suspended payment, is not evidence of itself, that the notes were worthless; and that the defendants must prove that the notes were worthless, before the jury can find a verdict in their favor.

" That if the jury believe, as is testified by Mr. Rowlett, that there is a large amount due to the bank; and if they further believe, that the bank, as testified to by him, never, to his knowledge, redeemed a single note at less than par, and that he believed it never did; and that the principal part of its circulation was paid in by debtors to the bank, and a large amount settled by note-holders taking individ-

ual paper . belonging to the bank ; and if they further be-
lieve, that there is no evidence as to what is the present con-
dition of the bank, further than to say it is insolvent, and
has a large amount due to it ; in such case, the jury should
find that the notes were of some value, and that conse-
quently, they must in such case find for the plaintiff."

These were all refused, together with several others, sub-
stantially involving the same principles, to all of which the
plaintiff excepted. In refusing these instructions, we think
the court erred.

As to the first one, we can readily see, that if the sum de-
ducted, to wit : fifty-five dollars, was more than usual in
such transactions, it might, and would very legitimately
have an influence in determining whether the notes were
taken by defendants, at their own risk. How much it
would tend to prove this fact, it was not for the court to de-
termine. If it, in any manner, threw light on the character
of the transfer, and in what way the defendants received the
notes, it was peculiarly the province of the jury to judge of
its effects. If, instead of taking this paper currency at the
usual rate of discount, or charging for drafts issued thereon,
the usual rate of exchange, they had charged or taken five
or ten per cent. additional, it would certainly be entitled to
much weight in determining whether it was taken on the
faith of Ring's representations, and his undertaking and
ability to redeem it, or at their own risk, as an adventure
which they, as bankers, were willing to take, relying upon
their own judgment. This instruction, we think, therefore,
should have been given, and its refusal was error, which we
can well see may have prejudiced the plaintiff.

With regard to the point raised by the other instructions,
one or two additional facts disclosed by the record, become
material to be stated. In the first place, the defendants claim
in their answer, that there was an entire failure of considera-
tion, and that the notes received were worthless, and of no
value whatever. And in the next place, there appears. to
have been no offer to return these notes, and rescind the
contract, or to deliver them up, at or before the trial. But,

for aught that appears, the defendants still retain said cur rency in their possession, and may use it in the market, for whatever it may bring, if anything. It is true that it appears that the $2,000 received by them, was presented at the counter of the Farmers' Bank in Chicago, for redemp tion; and it is also claimed, that the testimony shows, that at the time the certificate of deposit was presented for pay ment, there was an offer to pay the same in Memphis cur rency; but it will be observed, that in both of these in stances, there was no offer to rescind, or to place the depositor or depositors in the condition they were before the deposit; and that in each case, the defendants claimed virtually to retain the fifty-five dollars, the discount or exchange charged for the draft and certificate. Under these circumstances, we think, it was error to refuse the instructions asked by plaintiff on the subject of entire and partial failure of consideration. Had the subject of this trade, been property of any other kind, and there had been no offer to rescind the contract, and return the property received, it would scarcely be claimed, that the defendants could defeat the entire demand, unless there was an entire want or failure of consideration. Under a proper case made, they might defeat the action to the ex tent of the failure, but not beyond that, aside from the ques tion of recoupment of damages sustained, if any. Then, why should a different rule obtain, where the consideration was bank paper, as in this case? Why should the defend ants be allowed to retain in their possession, without any offer to place the plaintiff, as he stood before parting with this currency, and at the same time time entirely defeat the action, if this currency was of any value? Whether it was, or was not, of value, was for the jury to determine. It was a question of fact, like any other relating to the value of property. We know, from every days' experience, almost, that these banking corporations suspend; that their paper becomes uncurrent, and does not circulate at par, or at the usual rates of discount for paper currency. And we also know, just as well, that such paper may, and still does, have a marketable value, and will, and does, bring a price in the

market. The fact that the bank has suspended, may be, and certainly is, a very strong circumstance to show that the paper is of no value; but it is not conclusive upon that subject. If the jury, therefore, notwithstanding such suspension, from all the proof, believed that this paper was of some value, to that extent, on the state of the pleadings, the defendants should have been held liable. How far the testimony in all its parts, was conclusive as to the character and value of the paper, is no part of our duty to judge. It is sufficient to say, that if there was any conflict in the proof, or doubt as to the actual value of the property, such conflict and value should properly have been left for the consideration of the jury; and this, as we understand it, is what was claimed by the plaintiff in the instructions asked by him, and refused by the court. Suppose those notes, within one week after their receipt, were worth fifty or sixty per cent., and were selling for these sums in the market, what right would the defendants have to retain the same, make no offer to return them, and thus deprive the plaintiff, or Ring, of an opportunity to dispose of them? And if, afterwards, they should become entirely worthless, upon what fair or legal principle, could they claim that Ring should sustain this loss?

We think it was the duty of the defendants to have returned, or offered to return, these notes, within a reasonable time. If they did not do so, and the notes were of any value in the market, to that extent they would be liable. If of no value, whatever, and the jury believed the fraud and misrepresentation as charged, sustained by the proof, then, there being an entire want or failure of consideration, they should have found for the defendants.

Judgment reversed, and cause remanded.